UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Bankers' Bank Northeast, | |
| --- | --- |
| *Plaintiff*, | Civil No. 3:11cv262(JBA) |
| v. | |
| Everett Ayer, et al., | March 30, 2012 |
| *Defendants*. | |

### RULING ON DEFENDANT ARTHUR MARKOS' MOTION TO DISMISS

Plaintiff Banker's Bank Northeast ("BBN") brought this action against certain former directors and officers of the Savings Bank of Maine Bancorp ("SBM"), and SBM's accountant and auditor, Berry, Dunn, McNeil & Parker ("Berry Dunn"), for negligent misrepresentation and professional malpractice in connection with BBN's $18 million loan to SBM on September 16, 2008. Defendant Arthur Markos ("Markos"), the former President and CEO of SBM, moves to dismiss all counts against him for lack of personal jurisdiction and failure to state a claim upon which relief may be granted. (See Markos Mot. to Dismiss [Doc. # 66].) Oral argument on Markos' motion to dismiss was held on March 20, 2012. For the reasons that follow, this Court finds that it does not have personal jurisdiction over Markos. Rather than dismissing Markos, the entire action shall be transferred to the District Court of Maine pursuant to 28 U.S.C. § 1404(a).

**I.      BACKGROUND**

Plaintiff BBN is a bank chartered in Connecticut. The individual defendants, Arthur Markos, Everett Ayer, Richard Goodwin, Al Graceffa, George Heselton, Daniel Hollingdale, Robert Lacasse, Paul McClay, and John Rizzo, are residents of Maine. Subject matter jurisdiction is based on diversity jurisdiction pursuant to 28 U.S.C. §1332.

## II. FACTUAL ALLEGATIONS[1]

### A. BBN's Loan to SBM

SBM was a federally chartered bank holding company headquartered in Maine. (Compl. ¶ 2.) SBM's principal asset was the Savings Bank of Maine.[2] (Id. ¶ 2.) During the relevant period, Defendants Everett Ayer, Richard L. Goodwin, Al Graceffa, George Heselton, Daniel Hollingdale, Arthur Markos, Robert Lacasse, Paul McClay, and John Rizzo were directors of SBM.[3] (Id. ¶ 19.) Defendant Arthur Markos was also the president and CEO of SBM in addition to being a director. (Id. ¶ 21.)

In 2008, SBM sought to raise capital for use by the Savings Bank of Maine, (id. ¶ 24), so Anita Nored, SBM's treasurer, initiated discussions with Peter Garland, BBN's chief credit officer, regarding a loan from BBN. (Garland Decl. [Doc. # 72–1] ¶ 2.) BBN is a Connecticut-chartered bank that provides banking services to community banks and credit unions. As a bank that provides services to other banks, BBN offered a type of bank loan that could meet SBM's needs. (Compl. ¶ 25.) Accordingly, SBM and BBN entered into negotiations regarding a potential loan. (Id.)

In response to BBN's due diligence requests, Ms. Nored provided BBN with SBM's consolidated financial statements for the year ending December 31, 2007 ("2007 Audited

---

[1] All facts are derived from the Complaint and the affidavits accompanying the fully briefed Motion to Dismiss.

[2] Savings Bank of Maine Bancorp, the Savings Bank of Maine and any subsidiaries of the Savings Bank of Maine Bancorp or the Savings Bank of Maine bank are collectively referred to as "SBM."

[3] The composition of the Board of the Savings Bank of Maine and the Board of the Savings Bank of Maine Bancorp was identical. (Compl. ¶ 19.)

Financial Statements"). (See id. ¶ 3; Garland Decl. ¶ 3.) SBM also provided its June 2008 Monthly Profit Summary and the 2007 Loan Review Report. (Compl. ¶ 27.) The reports indicated that SBM had a $700 million loan portfolio and that SBM's probable loan losses on the portfolio were limited to $2.3 million. (Id. ¶ 6.) The 2007 Audited Financial Statements were audited by Berry Dunn and included an "Independent Auditor's Report" in which Berry Dunn represented that it had obtained "reasonable assurance" that the 2007 Audited Financial Statements were free of misstatement and presented in accordance with Generally Accepted Accounting Principles ("GAAP"). (See id. ¶¶ 3, 28.)

Acting as a representative of a consortium of community banks, BBN agreed to extend a loan to SBM. In September 2008, the directors of SBM authorized Ms. Nored to borrow up to $20 million from BBN and to sign any and all documents with respect to such a transaction. (Laughlin Decl., Ex. D [Doc. # 72–6].) On September 16, 2008, BBN and SBM entered into a loan agreement (the Original Loan Agreement) providing that BBN would loan SBM $18 million. (Compl. ¶ 9.) The Original Loan Agreement was signed by Ms. Nored for SBM and Mr. Garland for BBN. (Laughlin Decl., Ex. F [Doc. # 72–8].)

After it received the loan from BBN, SBM encountered severe financial difficulties. By early 2010, SBM was on the verge of insolvency and agreed to a restructuring plan led by Yorkshire Capital LLC ("Yorkshire") in order to avoid the bank's closure by the Federal Deposit Insurance Corporation ("FDIC"). (See Compl. ¶ 58) As part of the restructuring and takeover, Yorkshire demanded that the original loan from BBN be revised, and on May 26, 2010, Mr. Garland and Mr. Everets, the Chairman and CEO of the restructured SBM, signed an Amended Loan Agreement that reduced the principal of the loan between BBN and SBM from $18 to $9

3

million. (Id., Allentuch Decl., Ex. 1 [Doc. # 66–1].)

B.  BBN's Allegations of Misrepresentation

BBN now alleges that SBM's Directors made material misrepresentations of fact regarding SBM's financial condition in the Original Loan Agreement and in three earlier documents: SBM's 2007 Audited Financial Statements, the June 2008 Monthly Profit Summary, and the 2007 Loan Review Report. (Compl. ¶ 62.) The Original Loan Agreement represented that the 2007 Audited Financial Statement and the June 2008 Monthly Profit Summary fairly represented the financial positions of the Bank, were prepared in accordance with GAAP, did not contain any untrue statements of material fact, did not "omit a material fact necessary to make the statements contained therein or [in the Original Loan Agreement] not misleading," and that SBM had disclosed to BBN in writing any facts that had a material adverse effect on SBM and its ability to perform on the Loan Agreement. (Id. ¶¶ 9, 42). BBN claims these representations were false for two reasons: (1) SBM's process for collecting and analyzing data on its loan portfolio was in violation of GAAP; and (2) SBM's financial statements understated SBM's loan losses. (See id. ¶ 10.)

BBN's chief claim of misrepresentation is that SBM grossly understated the anticipated losses of its loan portfolio and, accordingly, required substantially larger loan loss provisions. BBN alleges that SBM's directors had a duty to ensure that the 2007 Audited Financial Statements reasonably presented SBM's financial status and that they failed to discharge this duty because SBM was not collecting required information on their loan portfolio that would have allowed them to assess SBM's probable losses. (Id. ¶ 8.)

BBN now seeks to recover the $9 million it lost when the loan was restructured, along

with interest owed, from the SBM Defendants and Berry Dunn because BBN relied on their misrepresentations in extending the loan to SBM.

## III. DISCUSSION

### A. Personal Jurisdiction over Markos

Defendant Arthur Markos ("Markos") claims that this Court cannot properly exercise jurisdiction over him. Plaintiff alleges that jurisdiction is proper in Connecticut because Markos: (1) transacted business in Connecticut; (2) committed a tortious acts within Connecticut; and (3) committed a tortious act outside of Connecticut that caused injury to BBN within Connecticut. (Pl. Opp. [Doc. # 72] 10–13.) Plaintiff also alleges that the exercise of personal jurisdiction over Markos comports with due process. (Id. at 15.) In response, Markos argues that he did not *individually* conduct business in Connecticut, contending that the facts alleged are insufficient to confer jurisdiction because they relate to conduct undertaken in his role as an agent for SBM. Moreover, Markos asserts that the exercise of jurisdiction over him individually would violate constitutional due process principles.

#### 1. Jurisdictional Facts[4]

Plaintiff is a Connecticut-chartered bank with its principal office in Glastonbury, Connecticut. Markos is a resident of the state of Maine. (See Compl. ¶ 21, Markos Decl. [Doc. # 66–2] ¶ 2.)

During 2008 and part of 2009, Markos was the President and CEO of SBM, which is headquartered in Gardiner, Maine. (See Markos Decl. ¶ 3.) In his capacity as Director and CEO

---

[4] All facts are derived from the Complaint, Plaintiff's record in opposition to Markos' Motion to Dismiss and the Declaration fo Arthur Markos.

of SBM, Markos signed, along with the other SBM directors, a form that authorized SBM to borrow up to $20 million from BBN and authorized Ms. Nored to sign any and all documents with respect to the transaction (the "Authorization Form"). (Laughlin Decl., Ex. D.) After the Original Loan Agreement was executed on September 16, 2008, Markos personally sent dozens of emails to BBN personnel located in Connecticut and frequently spoke with Peter Garland on the phone in connection with the loan between BBN and SBM. (See Laughlin Decl., Ex. A [Doc. # 72–3]; Garland Decl. ¶ 4.) Markos was also copied on several other emails from SBM personnel to BBN personnel located in Connecticut. (Garland Decl. ¶ 5.) On January 6, 2010, Markos traveled to Connecticut to discuss the repayment schedule of the loan with BBN personnel. (See Markos Decl. ¶ 6; Laughlin Decl., Ex. E [Doc. # 72–7].)

2. Legal Standard

Whether Markos, a non-resident individual, is subject to personal jurisdiction in this Court is determined by the law of the state in which the district court sits, i.e., Connecticut. Fed. R. Civ. P. 4(k)(1)(A). The determination of personal jurisdiction involves a two-part analysis. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002). First, the Court applies Connecticut's long-arm statute. Id. If the Court finds that the long-arm statute applies, the Court must then decide whether the exercise of jurisdiction over the defendant comports with due process. Id.

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." Bank Brussels Lambert, 171 F.3d at 784. When a court does not conduct a "full-blown evidentiary hearing" on the motion, the plaintiff need only make out "a prima facie showing that

6

the court possesses personal jurisdiction over the defendant." DiStefano v. Carozzi North America, Inc., 286 F.3d 81, 84 (2d Cir. 2001) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)); Knipple v. Viking Communications, Ltd., 236 Conn. 602, 608 (1996) (considering "the undisputed factual allegations in the complaint as well as the undisputed factual allegations in [plaintiff's] affidavits when adjudicating the motion where no evidentiary hearing has been held"). Such a showing must be made by alleging facts, not simply conclusions, but the Court "construe[s] jurisdictional allegations liberally and takes as true uncontroverted factual allegations." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (internal citations omitted). Moreover, in Connecticut, "[w]hen a motion to dismiss for lack of personal jurisdiction raises a factual question which is not determinable from the face of the record, the burden of proof is on the plaintiff to present evidence which will establish jurisdiction." Standard Tallow Corp. v. Jowdy, 190 Conn. 48, 54 (1983).

### 3. Contacts with Connecticut

The section of the Connecticut long-arm statute applicable to nonresident individual defendants provides, in relevant part, that:

> [a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state . . . ; (3) commits a tortious act outside the state causing injury to a person or property within the state . . . [if such a person] (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

Conn. Gen. Stat. § 52-59b(a). "In order to find personal jurisdiction over a nonresident defendant, only one of the provisions of Conn. Gen. Stat. § 52-59b(a) needs to be satisfied."

7

Vertrue Inc. v. Meshkin, 429 F. Supp. 2d 479, 489 (D. Conn. 2006) (citing Pro Performance Corporate Servs., Inc. v. Goldman, 47 Conn. Super. 476, 483 (2002)).

        a.      *Fiduciary Shield Doctrine*

Markos invokes the fiduciary shield doctrine[5] and argues that Plaintiff cannot establish personal jurisdiction over him in Connecticut because any contact he had with the State was purely in a representative capacity as an agent of SBM. (Def. Reply at 2-4.) Several Connecticut courts have, in recent decisions, rejected the fiduciary shield doctrine on the grounds that it is unsupported by the text and underlying policy of § 52-59b and that the concerns underlying the doctrine were sufficiently protected by due process. See, e.g., Vertrue, 429 F. Supp. 2d at 490-91; Panterra Engineered Plastics, Inc. v. Transportation Sys. Solutions, LLC, 455 F. Supp. 2d 104, 112-13 (D. Conn. 2006); Under Par Assocs. LLC v. Wash Depot A., Inc., 47 Conn. Supp. 319 (2001). Moreover, Connecticut's long-arm statute was modeled after the New York long-arm statute and while the doctrine was "initially considered to be a substantive requirement of New York Law," Under Par, 47 Conn. Supp. at 325 (citing U.S. v. Montreal Trust Co., 358 F.2d 239, 243 (2d Cir.), cert denied, 348 U.S. 919 (1966)), it has now been rejected by the New York Court of Appeals. Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470 (1988). Markos cites two cases from this district, Adams v. Wex, 56 F. Supp. 2d 227 (D. Conn. 1999), and Milne v. Catuogno Court Reporting Servs, 239 F. Supp. 2d 195 (D. Conn. 2002), which have applied the

---

[5] The "fiduciary shield doctrine" is based on the rationale that it would be unjust and inequitable to "force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." Marine Midland Bank, 664 F.2d at 902. "The doctrine prevents courts from exercising jurisdiction over nonresident corporate officers 'based on [the] transaction of business in Connecticut where the [officer] did not transact any business other than through his corporation.'" Vertrue, 429 F. Supp. 2d at 481 n.4.

8

fiduciary shield doctrine. See also Hagar v. Zaidman, 797 F. Supp. 132 (D. Conn. 1992); Bross Utils. Serv. Corp. v. Aboubshait, 489 F. Supp. 1366 (D. Conn. 1980). However, the more recently decided Panterra Engineered Plastics v. Transportation Sys. Solutions, LLC, 455 F. Supp. 2d 104, concluded that "the fiduciary shield doctrine does not bar the assertion of long-arm jurisdiction" over individual defendants "simply because they were acting on behalf of a corporation or other entity." Id. at 112-13 (internal quotations omitted); accord Grunberger Jewelers v. Leone, No. 3:03cv647, 2004 WL 1393608, at *3 (D. Conn. June 18, 2004). Accordingly, this Court concludes that the fiduciary shield doctrine is not a bar to establishing personal jurisdiction over Markos.

Having rejected the fiduciary shield doctrine as a bar to jurisdiction, the Court must still assess Markos' *personal* contacts with the forum, both with regard to the long-arm statute and due process analysis, to decide whether personal jurisdiction is proper, see Under Par, 47 Conn. Supp. at 327, because "[w]hile the actions of a corporate officer may typically be attributed to the corporation under agency principles for purposes of determining jurisdiction over the corporation, the actions of the corporation (undertaken by other individuals) should not ordinarily be attributed to the individual corporate officer for purposes of determining whether jurisdiction exists over that individual." Grunberger Jewelers, 2004 WL 1393608, at * 3. Individuals should not be shielded from their *own* conduct simply because they were acting on behalf of a corporation, but neither should the conduct of an employee taken on behalf of the corporation be attributed to *another* employee for the purposes of determining jurisdiction. See Calder v. Jones, 465 U.S. 783, 790 (1984) ("Petitioners are correct that their contacts with [the forum state] are not to be judged according to their employer's activities there. On the other hand, their status as

9

employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."); World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) ("[T]he mere 'unilateral activity of those who claim some relationship with the nonresident defendant cannot satisfy the requirement of contact with the forum state.'") (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

> b.  *Whether Defendant Markos Transacted Business in Connecticut for Purposes of Connecticut General Statute § 52-59b(a)(1)*

The phrase "transacts any business," in § 52-59b(a)(1) is undefined by the statute, but the Connecticut Supreme Court has interpreted it "to embrace a single purposeful business transaction." Zartolas v. Nisenfeld, 184 Conn. 471, 474 (1981). In Zartolas v. Nisenfeld, the Connecticut Supreme Court held that "[i]n determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within this state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of relevant factors." Id. at 477.

Plaintiff argues that Markos "transacted business" in Connecticut by signing the Authorization Form that authorized SBM Treasurer Nored to enter into a loan agreement with BBN, by sending emails and making calls to BBN personnel located in Connecticut, and by visiting Connecticut for a meeting hosted by BBN. At oral argument, Plaintiff's counsel focused on the signing of the Authorization Form as the key conduct demonstrating that Markos "transacted business" in Connecticut, while his communication with BBN personnel and visit to the state are of secondary significance—the "icing on the cake"—in establishing jurisdiction.

The Court is unpersuaded by Plaintiff's argument that Markos "transacted business" in

10

Connecticut by signing the Authorization Form. During oral argument, Plaintiff's counsel argued that although Markos did not sign the Authorization Form in Connecticut, the form establishes that Ms. Nored was acting as Markos' agent when she signed the Original Loan Agreement, and her actions in Connecticut can, therefore, be attributed to Markos for the purposes of establishing jurisdiction. However, this argument conflates theories of establishing jurisdiction with theories of establishing liability. When Ms. Nored entered into the Original Loan Agreement with BBN, she was acting on behalf of SBM, not Markos, and as discussed *supra*, the conduct of an employee taken on behalf of the corporation cannot be attributed to *another* employee for the purposes of determining jurisdiction. Although the Authorization Form may be relevant to whether Markos is *liable* for the alleged negligent misrepresentations made to BBN, only his personal contacts with Connecticut may be assessed to determine if jurisdiction is proper. As it is undisputed that Markos signed the Authorization Form in Maine, Plaintiff's assertion that Markos "transacted business" in Connecticut merely by signing a form authorizing SBM to obtain a loan from BBN, a Connecticut corporation, fails.

Plaintiff's counsel properly acknowledged that, without more, Markos' communications with BBN personnel and visit to Connecticut are insufficient contacts to confer jurisdiction under the CT long-arm statute. Although the communications and visit were related to the Original Loan Agreement, they occured well after the alleged negligent misrepresentations had been made. While there are circumstances where contacts a defendant had with the state after the alleged cause of action accrued may be considered for the purposes of determining jurisdiction, see Vertrue, 429 F. Supp. at 491, this Court is unaware of, and Plaintiff has not identified, any case where a court found that jurisdiction was proper under "transacting business" when the *only*

11

contacts the defendant had with the forum were after the cause of action accrued.

        c.        *Tort-Based Jurisdictional Allegations*

Plaintiff also argues that the Court has personal jurisdiction over Markos under two other provisions of Conn. Gen. Stat. § 52-59b–Conn. Gen. Stat. § 52-59b(a)(2) and (3), which permit exercise of jurisdiction over a nonresident individual who (2) "commits a tortious action within the state" or (3) "commits a tortious act outside the state causing injury to a person or property within the state."

Plaintiff asserts that jurisdiction over Markos is proper pursuant to § 52-59b(a)(2) because he allegedly directed Ms. Nored to transmit false representations and financial statements to BBN in Connecticut and authorized her to "sign any and all documents" related to the loan from BBN to SBM, including the original loan which was signed in Connecticut and allegedly contained false representations concerning SBMs's financial statements, disclosure and core capital. (Def. Opp. at 12 (citing Laughlin Decl., Ex. D; Garland Decl. ¶ 2-5).) "[F]alse or fraudulent misrepresentations transmitted to Connecticut by mail, wire or telephone constitute tortious conduct in Connecticut sufficient to establish personal jurisdiction under Connecticut's long-arm statute." Vertrue, 429 F. Supp. 2d at 492. See, e.g., Knipple, 236 Conn. at 610 ("False representations entering Connecticut by wire or mail constitute tortious conduct in Connecticut under § 33-411(c)(4)."); Horniatko v. Riverfront Assoc., LLC, No. CV044000332S, 2005 WL 1671543, at *4 (Conn. Super. Ct. June 21, 2005) (finding solicitation phone calls to Connecticut provided basis for personal jurisdiction under section 52-59b(a)(2)); Doe v. Oliver, No. CV990151679S, 2003 WL 21235402, at *2 (Conn. Super. Ct. May 19, 2003). Plaintiff, however, alleges that Ms. Nored, not Markos, personally transmitted the false misrepresentation

to Connecticut. As discussed, *supra*, the actions of a corporation (undertaken by other individuals) should not ordinarily be attributed to the individual corporate officer for purposes of determining whether jurisdiction exists over that individual. When Ms. Nored transmitted the alleged misrepresentations to Connecticut, she was acting as an agent of SBM, not Markos, and her actions may not be attributed to Markos for the purposes of determining jurisdiction. See Grunberger Jewelers, 2004 WL 1393608, at *3 (declining to consider the actions of the defendant's employer, for which there was no evidence or allegations that the defendant was personally responsible, as a basis for determining personal jurisdiction over him). Accordingly, Plaintiff has failed to establish a prima facie case of tortious conduct in Connecticut by Markos sufficient to establish personal jurisdiction over Markos pursuant to § 52-59b(a)(2) of Connecticut's long-arm statute.

Plaintiff also claims that jurisdiction is proper pursuant to § 52-59b(a)(3) because Markos committed a tortious act outside of Connecticut that caused harm to BBN in Connecticut. In order to assert jurisdiction under § 52-59b(a)(3), it must first be determined whether the injury to Plaintiff occurred in Connecticut. See Bross Utils. Serv. Corp. v. Aboubshait, 489 F. Supp. 1366, 1374 (D. Conn 1980), aff'd., 646 F.2d 559 (2d Cir. 1980); Vertrue, 429 F. Supp. 2d at 493. "Plaintiff's residence in the state is not enough; 'the determinative factor is evidence of direct economic injury to the plaintiff within the state.'" Vertrue, 429 F. Supp. 2d at 493 (quoting Greene v. Sha-Na-Na, 637 F. Supp. 591, 597 (D. Conn. 1986)). "[I]n the context of commercial torts, the place of injury is generally the place where the critical events associated with the dispute took place." Bross Utils. Serv. Corp., 489 F. Supp. at 1374 (construing § 52-59b(a)(3) in light of nearly identical provisions of New York's long-arm statute) (internal quotation omitted));

Vertrue, 429 F. Supp. 2d at 494. See also Ryan v. Cerullo, 282 Conn. 109, 124 n.15 (2007) (citing to the "critical events test" with approval).

Plaintiff argues that the "critical events" occurred in Connecticut because the alleged misrepresentations were transmitted to Connecticut via email and BBN's business and assets harmed by the loss of the advance are located in Connecticut. (Def. Opp. at 14). Plaintiff's argument fails. As discussed *supra*, Markos did not personally transmit any of the alleged misrepresentations to Connecticut and the actions of other SBM employees may not be attributed to him for the purposes of establishing personal jurisdiction. Plaintiff alleges that Markos harmed BBN by negligently misrepresenting SBM's financial status in SBM's financial statements and the Original Loan Agreement. However, any contribution of Markos to preparation of the allegedly fraudulent documents was done in Maine (Markos Decl. ¶ 3) and as previously established, he did not transmit the documents to Connecticut. As Plaintiff has not alleged that Markos made any misrepresentations in the communications he had with BBN after the Original Loan Agreement was executed, the only tortious conduct Plaintiff alleges Markos committed occurred in Maine. Accordingly, the "critical events" of Markos's alleged tortious conduct necessarily occurred in Maine as well, and jurisdiction in Connecticut pursuant to § 52-59b(a)(3) would be improper.[6] See Whitaker v. American Telecasting, Inc., F.3d 196, 209 (2d Cir. 2001) ("The occurrence of financial consequences in New York due to the fortuitous location of plaintiff[ ] in New York is not a sufficient basis for jurisdiction . . . where the

---

[6]The Plaintiff could clearly establish that SBM committed a tortious act where the critical events took place in Connecticut because the allegedly fraudulent Original Loan Agreement was executed and largely negotiated in Connecticut; however the Plaintiff cannot use the corporation's conduct as a basis of jurisdiction over Markos because Markos neither negotiated nor signed the Original Loan Agreement.

underlying events took place outside New York.").

### 4. Due Process

As the Court has concluded that it does not have jurisdiction over Markos pursuant to the Connecticut Long-Arm statute, it need not analyze whether the exercise of jurisdiction would comport with due process.

**B.    Transfer**

Having determined that Markos is not subject to personal jurisdiction in Connecticut, the Court must determine if it should allow the claims against the remaining Defendants to continue in this Court or if the entire action should be transferred to a forum where all of the claims against all of the Defendants could be before the same court.[7]

28 U.S.C. 1404(a) provides that a district court may transfer any civil action for the convenience of parties and witnesses and in the interests of justice. In determining whether a transfer of venue pursuant to 28 U.S.C. § 1404(a) is appropriate, district courts engage in a two-part inquiry, asking: (1) whether an action "might have been brought" in the proposed transferee forum, and, if so, (2) whether the transfer promotes convenience and justice. See MAK Marketing v. Kalapos, 620 F. Supp. 2d 295, 307 (D. Conn. 2009); see also Forjone v. California,

---

[7] "[E]ven if there is no personal jurisdiction over the defendant[], and [regardless of] whether ... venue is proper in the district," a Court may transfer a case if a transfer would be "in the interest of justice." See Corke v. Sameiet M.S. Song of Nor., 572 F.2d 77, 80 (2d Cir. 1978); see also SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 179 n.9 (2d Cir. 2000) (noting that "whether or not venue was proper, lack of personal jurisdiction could be cured by transfer to a district in which personal jurisdiction could be exercised, with the transfer authority derived from either § 1406(a) or § 1404(a)"); Murphy v. Bradley, No. 303CV714 (DJS), 2004 WL 202419, at *3 (D. Conn. Jan.16, 2004) (noting that transfer is favored to remove obstacles such as lack of personal jurisdiction); cf. Red Bull Assocs. v. Best W. Int'l, Inc., 862 F.2d 963, 967 (2d Cir. 1988) (holding that in deciding a motion to transfer under 28 U.S.C. § 1404(a), the district court has "considerable discretion").

15

425 Fed. Appx. 73, 74 (2d Cir. 2011).

      1.      <u>Whether the Case Might Have Been Brought in the District of Maine</u>

To decide whether an action "might have been brought" in the proposed transferee forum, the court must first determine whether the defendants are subject to personal jurisdiction in that forum, and whether venue would properly lie there. <u>See</u> <u>generally</u> <u>Farrell v. Wyatt</u>, 408 F.2d 662, 666 (2d Cir. 1969). All of the Defendants are subject to personal jurisdiction in Maine, as it is undisputed that all the individual Defendants are residents of the state and Berry Dunn is headquartered there. Venue would also be proper in the District of Maine. <u>See</u> 28 U.S.C. § 1391(a) and (c). Therefore, these cases "might have been brought" in the District of Maine. 28 U.S.C. § 1404(a).

      2.      <u>Whether Transfer Would Promote the Convenience of Parties and Witnesses and the Interests of Justice</u>

In the second part of the section 1404(a) inquiry, the Court must consider whether a transfer promotes convenience and justice. District courts have broad discretion to make case-by-case determinations of convenience and fairness, <u>In re Cuyahoga Equipment Corp.</u>, 980 F.2d 110, 117 (2d Cir. 1992) (citing <u>Stewart Org. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988)). In making their determinations, courts consider, inter alia, (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, (7) the relative means of the parties, (8) the forum's familiarity with the governing law, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. <u>See</u> <u>D.H. Blair & Co. v.</u>

Gottdiener, 462 F.3d 95, 106–107 (2d Cir. 2006); Hanninen v. Fedoravitch, 583 F. Supp. 2d 322, 331 (D. Conn. 2008).

In this case, the balance of factors supports transfer of the action to the District of Maine. While a district court should give a plaintiff's choice of forum substantial weight, see In re Warrick, 70 F.3d 736, 741 (2d Cir.1995), all other considerations indicate that Maine is a better forum for this action. First, the locus of operative facts was in Maine—the state where the allegedly inaccurate financial statements were created and audited. Second, Maine is a more convenient forum for most of the potential witnesses and for relative ease of access to sources of proof. The gravamen of Plaintiff's claim is that the directors of SBM and the auditors at Berry Dunn knew or should have known that they did not have the necessary information on SBM's loan portfolio to predict SBM's potential loan losses. Proceeding in Maine would facilitate the parties access to the testimony of SBM and Berry Dunn employees, as well as to any documents on SBM's loan portfolio that support Plaintiff's claim.

Finally, trial efficiency and the interests of justice strongly support the transfer of this action to the District of Maine. If this action were to remain in the District Court of Connecticut, Markos would necessarily be dismissed for lack of jurisdiction. The Plaintiff would then have to refile its claim against him in Maine, where he is subject to jurisdiction, and this case would be split into two actions in two different districts. This factor weighs very heavily in favor of transfer, as efficiency and the interests of justice are greatly advanced if all the claims, against all defendants, are before the same court, and presumably the same judge.

## IV. CONCLUSION

For the reasons stated above, the Court orders that this case be TRANSFERRED to the

District of Maine pursuant to 28 U.S.C. § 1404(a). Defendant Markos' Motion to Dismiss [Doc. # 66] is DENIED AS MOOT.

              IT IS SO ORDERED.

              /s/
              Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of March, 2012.